| | |
|---|---|
| **DISTRICT COURT, DOUGLAS COUNTY, STATE OF COLORADO**<br>4000 Justice Way<br>Castle Rock, CO 80109<br>Telephone: (720) 437-6200 | DATE FILED: March 9, 2020 5:12 PM<br>FILING ID: FFD52494C468C<br>CASE NUMBER: 2020CV30227 |
| **Plaintiff:**    **CRISTI LUNDQUIST**<br><br>v.<br><br>**Defendants:**    **DOUGLAS COUNTY SHERIFF'S OFFICE; LEROY NICHOLS**, in his Individual capacity. | ▲ COURT USE ONLY ▲<br><br>**Case Number:**<br><br>**Division:** |
| Bradley A. Levin, Atty. No. 13095<br>Elisabeth L. Owen, Atty. No. 42556<br>**LEVIN SITCOFF PC**<br>1512 Larimer, Suite 650<br>Denver, Colorado 80202<br>(303) 575-9390<br>bal@levinsitcoff.com<br>elo@levinsitcoff.com | |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff, Cristi Lundquist, by and through her attorneys, LEVIN SITCOFF PC, for her Complaint and Jury Demand against Defendants Douglas County Sheriff's Office and Leroy Nichols (collectively, "Defendants"), states and alleges as follows:

## INTRODUCTION

In this case, Plaintiff Cristi Lundquist ("Ms. Lundquist") seeks vindication of her rights protected by the United States Constitution and under the common law because a Douglas County Sheriff's Deputy, Leroy Nichols ("Nichols"), broke her arm when he unlawfully entered Ms. Lundquist's home to conduct a purported welfare check. Even though Nichols and two other

**EXHIBIT B**

deputies found Ms. Lundquist at her home, conscious, walking, and talking, Nichols forced his way inside and refused to leave after Ms. Lundquist repeatedly asked him to do so. Nichols explained that one of the reasons he would not leave was that his own wife is an alcoholic. Then, as Ms. Lundquist began to walk away from Nichols, into her home, Nichols grabbed Ms. Lundquist's right arm and forcefully pulled it downward, causing an audible snapping sound. Subsequently, even though Nichols plainly realized that he had hurt Ms. Lundquist, he continued to forcefully jostle Ms. Lundquist's arm in an effort to prevent her from moving freely in her own apartment, causing her further injury.

As a consequence of Nichols' conduct in breaking Ms. Lundquist's arm without any law enforcement-related justification at all, Ms. Lundquist has suffered serious and permanent injury. In addition to the pain and limitations she experienced immediately after Nichols broke her arm, Ms. Lundquist, today, continues to have severe nerve pain that radiates down her right arm, diminished grip and right hand weakness, inability to lift her arm above her shoulder, and inability to perform certain activities of daily living. Consequently, Ms. Lundquist brings this action seeking the remedy the legal system affords her, monetary damages.

## PARTIES, JURISDICTION, AND VENUE

1. Ms. Lundquist is an individual residing in Aurora, Colorado.

2. Defendant Douglas County Sheriff's Office ("DCSO") is a law enforcement agency in Douglas County, Colorado, and is located at 4000 Justice Way, Castle Rock, Colorado 80129.

3. Defendant Nichols is an employee of Douglas County Sheriff's Office and was at the scene of the subject incident which gives rise to Ms. Lundquist's claims in this action. Defendant Nichols is sued in his individual capacity.

**EXHIBIT B**

4. The Court has jurisdiction over Ms. Lundquist's claims under § 13-1-124(b), C.R.S., because the acts giving rise to Ms. Lundquist's claims were committed in the State of Colorado, and pursuant to 42 U.S.C. § 1983.

5. Pursuant to C.R.C.P. 98(c), venue is proper in this Court, which Ms. Lundquist designates as the place of trial for this action.

### FACTUAL ALLEGATIONS

6. On August 14, 2017, at around 8:00 a.m., DCSO dispatched Nichols and two other deputies, Rolf Widmer ("Widmer") and Christopher Lippolis ("Lippolis"), to Ms. Lundquist's home located at 10177 Station Way, Unit #321, Lone Tree, Colorado, which is in Douglas County.

7. The purpose of Nichols', Widmer's, and Lippolis' visit to Ms. Lundquist's home was to perform a "welfare check" in response to a request by Lisa Zeiher, Ms. Lundquist's sister, who had not heard from Ms. Lundquist since about 1:45 p.m. the day before.

8. The purpose of Nichols', Widmer's, and Lippolis' visit to Ms. Lundquist's home was *not* to investigate a crime. Ms. Lundquist was not suspected of engaging in any criminal conduct whatsoever.

9. At the time, Ms. Lundquist was 58 years old, approximately 5 feet 4 inches in height, and weighed approximately 120 pounds.

10. At the time of dispatch, Nichols, Widmer, and Lippolis understood that Ms. Lundquist lived alone with no then-present mental health concerns.

11. Nichols, Widmer, and Lippolis arrived at Ms. Lundquist's apartment complex to discover that the building was secured. Another apartment resident who was walking her dog let them into the building.

**EXHIBIT B**

12. At Ms. Lundquist's door, Nichols, Widmer, and Lippolis knocked several times, and Ms. Lundquist answered the door, opening it between one and one and a half feet wide. When Ms. Lundquist opened her door, it was apparent that she was conscious and walking and talking on her own. Ms. Lundquist did not present in any obvious distress.

13. Ms. Lundquist attempted to close the door, but Nichols placed his foot at the bottom of the door jamb to prevent her from doing so.

14. After stopping Ms. Lundquist from closing her door, Nichols activated his body camera.

15. After Ms. Lundquist refused to identify herself, Nichols communicated with dispatch over the radio to confirm her identity. At that juncture, Ms. Lundquist opened the door, and Nichols entered her home.

16. Widmer and Lippolis did not fully enter the premises. Lippolis stood in the door frame while keeping the front door open. Widmer remained in the hallway outside Ms. Lundquist's door.

17. Ms. Lundquist confirmed her identity.

18. When Nichols told Ms. Lundquist that her sister had called law enforcement because she was worried about her, Ms. Lundquist responded that she was an alcoholic but did not want any help.

19. Ms. Lundquist and Nichols engaged in a short verbal exchange, during which Ms. Lundquist repeatedly asked Nichols to leave her apartment and Nichols repeatedly refused. At one point, Nichols told Ms. Lundquist he would not leave because his wife is an alcoholic.

20. After Nichols refused to leave, and especially after he told Ms. Lundquist that his wife is an alcoholic, Ms. Lundquist became visibly upset and ordered Nichols, Widmer, and Lippolis out of her home. She tried to close the door on Widmer and Lippolis while saying "bye."



Bodycam Footage (Nichols' Perspective), at 14:23:02, attached hereto as **Exhibit 1**.

21. Ms. Lundquist again told Nichols, Widmer, and Lippolis "good bye."

22. Ms. Lundquist turned to walk into her apartment, toward the living room and bedroom. As she did, Nichols grabbed Ms. Lundquist's right wrist and hand and brought it behind her back to restrain her.

23. Ms. Lundquist cried out, "Ow! You cannot do this to me!"

**EXHIBIT B**



Bodycam Footage (Lippolis Perspective), at 14:23:53, attached hereto as **Exhibit 2**.



**Exhibit 1** at 14:23:53.

24. Ms. Lundquist pulled her hand out of Nichols' grip. In response, Nichols forcefully grabbed Ms. Lundquist's right arm, wrenching her forearm down with his right hand at the same time that he held her upper right arm with his left hand. When he did that, Ms. Lundquist's arm

6
**EXHIBIT B**

made an audible cracking sound. Ms. Lundquist immediately complained that her right arm hurt and that Defendant Nichols had broken her arm.



**Exhibit 1** at 14:24:21.

25. Nichols used his radio to call for medical assistance. Widmer and Lippolis entered Ms. Lundquist's home.

26. Even though Nichols plainly recognized that he had hurt Ms. Lundquist, he pushed her onto her couch. Then, Nichols pressed into, tugged at, bent, and twisted Ms. Lundquist's injured arm. He continued to jostle Ms. Lundquist's arm as though he could shake her injury off.

27. While Ms. Lundquist sat on her couch, complaining of pain, Nichols held onto Ms. Lundquist's right hand and wrist with both of his hands. Lippolis held onto her left wrist and hand.



**Exhibit 1** at 14:26:58.



Bodycam Footage (Widmer Perspective), at 14:27:14, attached hereto as **Exhibit 3**.

28. Ms. Lundquist repeatedly complained, approximately fifteen times, "You're hurting me!" as Nichols and Lippolis continued to firmly hold onto her wrists and hands.

8
**EXHIBIT B**

29. Ms. Lundquist repeatedly pleaded with Nichols and Lippolis to let go of her arm, but they refused.

30. After letting go of Ms. Lundquist's hand, Nichols pressed her right shoulder into the couch to keep her from getting up to retrieve her phone.

31. Widmer threatened Ms. Lundquist that he would place her in handcuffs if she attempted to get up from her couch one more time.

32. Nichols told Ms. Lundquist that it was her fault that her arm had broken.

33. Paramedics arrived at Ms. Lundquist's home and noted an obvious deformity to her right upper arm with increased pain on palpitation. Ms. Lundquist was administered fentanyl for her pain and transported to Sky Ridge Medical Center.

34. At the hospital, Ms. Lundquist was diagnosed with right shoulder periprosthetic humeral shaft fracture near the area of a previous shoulder replacement surgery and lateral displacement of the distal fracture fragment with marked apex anterior angulation.

35. Ms. Lundquist underwent right shoulder revision of both components of the reverse total shoulder arthroplasty, right shoulder open reduction and internal fixation of humeral shaft periprosthetic fracture, and right arm placement of large allograft.

36. As a result of Defendants' conduct, Ms. Lundquist has suffered and/or still suffers from pain, weakness, numbness, and sharp sensations in her right arm, shoulder, and hand; severe right radial nerve damage; wrist drop; inability to extend her wrist, thumb, and fingers; and depression due to her injuries, which have significantly impacted and continues to affect her daily life activities.

37. On information and belief, Nichols is no longer employed with DCSO.

38. On information and belief, DCSO does not provide training to its deputies, including Nichols, regarding use of force during welfare checks.

39. On information and belief, the only use of force training DCSO provides deputies relates to *how* to use force. On information and belief, DCSO does not provide deputies specific training about *when* to use force that would have aided Nichols in assessing whether it was reasonable under the circumstances for him to use force against Ms. Lundquist.

40. On information and belief, DCSO's use of force training over-emphasizes use of force techniques and encourages a form of policing that induces hyper-vigilance in deputies, which causes DCSO deputies like Nichols to be unable to accurately assess the level of threat in a given situation. Consequently, DCSO deputies are led, by their training, to overuse force when it is not reasonably necessary under the circumstances.

41. In other words, on information and belief, DCSO deputies are trained to perceive even benign interactions as threatening, and to use physical force upon their perception of that threat. As a result, Nichols treated Ms. Lundquist's obvious non-threatening conduct as that which required physical force, causing Nichols to hurt Ms. Lundquist even though his stated purpose for unlawfully entering Ms. Lundquist's home was to help her.

42. Nichols' unreasonable and unjustified use of force against Ms. Lundquist, and DCSO's failure to train Nichols in such a way that caused that unreasonable and unjustified use of force, caused Ms. Lundquist's injuries.

**FIRST CLAIM FOR RELIEF**
**Excessive Use of Force in Violation of the Fourth and Fourteenth Amendments to the United States Constitution**
(Against Defendants DCSO and Nichols)

43. Ms. Lundquist restates and realleges each and every paragraph of her Complaint as if fully set forth herein.

44. At the time that Nichols entered Ms. Lundquist's home, she had a right, protected by the Fourth and Fourteenth Amendments to the U.S. Constitution, against a law enforcement officer's use of excessive force against her.

45. At no time did Nichols or any other DCSO deputy suspect that Ms. Lundquist had committed a crime.

46. At no point was Ms. Lundquist placed under arrest.

47. Nichols had no reason to believe, and indeed did not believe, that Ms. Lundquist posed any threat to him or any other person when he broke her arm.

48. Nichols' seized Ms. Lundquist when he grabbed her arm and broke it.

49. Nichols' violent seizure of Ms. Lundquist's person did not reasonably further any legitimate governmental interest.

50. Nichols' use of force against Ms. Lundquist was unreasonable.

51. DCSO's training caused Nichols to treat Ms. Lundquist as though she was dangerous when she obviously was not.

52. DCSO's training induced Nichols to unreasonably use force in an obviously non-threatening situation.

53. Nichols and DCSO caused Ms. Lundquist's injuries. As a result, under 42 U.S.C. § 1983, Ms. Lundquist is entitled to compensatory and punitive damages in amounts to be determined at trial.

**WHEREFORE**, Plaintiff prays for judgment as follows:

a. Compensatory and punitive damages in amounts to be determined by the jury;

b. Reasonable attorneys' fees and expenses, expert witness fees, and the costs of suit herein;

c. Interest, statutory and moratory, allowed by law;

d. Such other and further relief as the court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

DATED this 9th day of March, 2020.

Respectfully submitted,

**LEVIN SITCOFF PC**

*s/ Elisabeth L. Owen*
Bradley A. Levin
Elisabeth L. Owen
*Attorneys for Plaintiff*

Plaintiff's Address:
22641 E. Del Norte Dr.
Parker, CO 80138

# Exhibit 1
# Body Cam Footage

# FILED CONVENTIONALLY

EXHIBIT B

# Exhibit 2
# Body Cam Footage

# FILED CONVENTIONALLY

EXHIBIT B

# Exhibit 3
# Body Cam Footage

# FILED CONVENTIONALLY

EXHIBIT B